RECEIVED
SEP 06 2023
U.S. District Court
Middle District of TN

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

Naya L Abbey, Pro Se

    Plaintiff,

v.

Metropolitan Nashville Tennessee capacity

    Defendants.

Case No. 3:23-cv-0300

Judge Crenshaw

Magistrate Judge Holmes

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Abbey Hereby Respectfully submits this opposition to Defendant's Motion to Dismiss the Complaint. The Plaintiff's Complaint not only meets but exceeds the standards governing the form of a complaint as required by Federal Rule of Civil Procedure 8(a). Specifically, this Court has personal jurisdiction over the Defendant, and the complaint sufficiently alleges causation and harm. Accordingly, Defendant's motion should be denied."[6]

Plaintiff brings this opposition and evidence of municipal liability before the court; Plaintiff brings Factual and legitimate theory of Municipal liability against MNPD and Metropolitan Government. For claims of malicious prosecution under the fourth amendment and a Speedy trial violation.

(a) Petitioner's contention that 1983 liability can be imposed only where the municipal policy in question is itself unconstitutional is rejected, in light of the rule established by the Court in this case that there are limited circumstances in which a "failure to train" allegation can be the basis for liability. Pp. 386-387.

(b) The inadequacy of police training may serve as the basis for 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact. In contrast to the Court of Appeals' overly broad rule, this "deliberate indifference" standard is most consistent with the rule of Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694, that a city is not liable under 1983 unless a municipal "policy" or "custom" is the moving force behind the constitutional violation. Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy." Monell will not be satisfied by a mere allegation that a training program represents a policy for which the city is responsible. Rather, the focus must be on whether the program is adequate to the tasks the particular employees must perform, and if it is not, on whether such inadequate training can justifiably be said to represent "city policy." *8.3.A.2. Establishing a "Custom, Policy or Practice" in the Absence of Written Guidelines or Repeated Acts: The Role of the "Final Policy-Making Authority" In addition to deprivations of rights caused by official policy, local governments may be sued for deprivations caused by "governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." To establish a custom or practice in the absence of a formal policy will usually require proof of repeated incidents suggesting a pattern or practice. The existence of a widespread practice can be so permanent and well-settled to constitute a custom or usage with the force of law. . 436 U.S. at 436 U. S. 694, and Polk County v. Dodson, 454 U. S. 312, 454 U. S. 326 (1981), that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As JUSTICE BRENNAN's opinion in Pembaur v. Cincinnati, 475 U. S. 469, 475 U. S. 483-484 (1986) (plurality) put it:*

*"[M]unicipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives"*

In this Opposition to defendants' motions to dismiss Plaintiff give accounts of unofficial customs/practices of police perjury and malicious prosecution by showing repeated cases where MNPD officers misused procedures to perform unnecessary "felony takedowns" to make arrest for crimes that weren't alleged or committed. To cover their mistakes MNPD officer used perjury under oath to influence a criminal charge of felony evading arrest on citizens. Where a

crime nor evading arrest was committed. But by officers' actions caused a citizen to be charged with the crime of evading arrest, which is a violation of citizens' rights. These practices violate citizen's rights to due process, liberty and their right to a speedy trial. Evidence was never presented by MNPD officers of the crime of evading in the cases that are mentioned later in this opposition to dismiss. In Plaintiff Abbey's case officers did not provide proof beyond reasonable doubt that plaintiff Abbey committed a crime.

# Argument

Plaintiff filed her Amended Complaint in this Fourth Amendment malicious prosecution action pursuant to 42 U.S.C. § 1983, alleging, inter alia, that Defendant: (1) charged Plaintiff with Evading arrest, Reckless Endangerment and arrested her without probable cause of the accusations; (2) falsely testified before the Davidson County General sessions court at Plaintiff's preliminary hearing , resulting in her case being bond over to the Grand Jury, causing her case to be bond over to criminal court and issuance of an indictment against her for Reckless endangerment and Evading Arrest in a Motor Vehicle; (3) intentionally swore out demonstrably false affidavit resulting in her being booked into jail, where she was incarcerated for three or four hours, before being released on "pretrial release"; and (4)Plaintiff contends that the false charges against her resulted in the deprivation of her liberty, as she was taken into custody, jailed, forced to comply with her conditions of pretrial release, had to attend numerous court dates defending her case, and "spent three years defending the meritless charges" before Judge Smith who dismissed the criminal case against her with prejudice on August 24,2022. *Id*. Plaintiff sues Defendant in its individual capacity, seeking nominal, compensatory, and punitive damages, attorney's fees and costs, pre- and post- judgment interest, and all other relief to which she may be entitled. *Id*.

In Paragraph 2 of plaintiff's amended complaint against Metropolitan Government, Plaintiff stated that she was falsely accused of felony evading arrest by MNPD officers. In plaintiff's amended complaint against MNPD in paragraph 2 and 3 of the amended complaint Plaintiff mentions how she was followed without her knowledge by MNPD in an unmarked vehicle. In this opposition to dismiss Plaintiff brings evidence of the actions that cause her pain and suffering. (**Exhibit A: is the dispatch recordings of Officer Terrance Stuckey during his pursuit of Plaintiff Abbey**) on August 14, 2019. (**Dispatch recording time 20.02.54 Notes**) Officer calls into dispatch claiming that he is behind a vehicle not stopping. At (**Timestamp 00:40-00:54**) Officer Stuckey is asked by the Dispatcher if he is pursuing plaintiff? Officer Stuckey states that he is not pursuing plaintiff he is just following her. He also claims that plaintiff "almost hits someone" while he was following her. Officer Stuckey states again that plaintiff is "not stopping and that he is not in pursuit of plaintiff". (**TIMESTAMP 00:59-01:02**) Officer Stuckey proceeds to contact Air one. Even though he stated that he is not in pursuit of Plaintiff. (**Time Stamp 01:23-01:35**) Officer Stuckey States once again "Please Be advised that I'm not in pursuit of the vehicle I'm just following the Vehicle, He's driving NORMAL speeds but if you can get air one up to it". No probable Cause was stated as to why Officer Stuckey was attempting to stop plaintiff or even why the officers were following plaintiff with no motive to pursue, no probable cause was stated as to why Aviation was called to follow plaintiff even though officers were right behind her and she was driving normal speeds. (**Timestamp 01:50-01:54**) An unknown Officer later identified as sergeant Charles S. Eaton chimes in to the call between officer Stuckey and the dispatcher. Dispatcher briefs Sergeant Charles S Eaton of the issue and gives description of Plaintiff's vehicle. (**Timestamp 02:05-02:10**) Officer Stuckey States "please be advised that the vehicle almost hit someone not trying to stop for me" (**Timestamp 02:10-02:18**) Sergeant Eaton asks Officer Stuckey if Plaintiff is fleeing from a traffic stop? (**Time stamp 02:19-02:32**)

Officer Stuckey states "No he's not fleeing I'm right behind him he's making a right turn onto Jefferson Street driving normal speeds, he's not stopping tags expired on the car" **(Timestamp 02:33-02:37)** Sergeant Eaton replies "copy, go ahead and pull off if you would Please" **(Timestamp 02:43-02:46)** Officer Stuckey states that he will but the plaintiff's vehicle is in front of him.

Citing **Code 2010 Tennessee Code <u>Title 39 - Criminal Offenses Chapter 16 - Offenses Against Administration of Government Part 6 - Obstruction of Justice 39-16-603 - Evading arrest Subsection (b) (1) It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop.</u>** It is obvious through the dispatch recordings (**Exhibit A**) mentioned above that Plaintiff had no idea Officer Stuckey was behind her and that she was not attempting to flee from officers in the unmarked vehicle behind her. Even though plaintiff was not fleeing and officers were told not to pursue yet the pursuit continued. (For 1983 purposes, a municipality's failure to act " in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom [municipal employees] come into contact.'" Connick, <u>563 U.S. at 61</u>(quoting Canton, <u>489 U.S. at 388</u> in context of failure to train). Only through deliberate and difference "can such a shortcoming be properly thought of as a[Municipal] 'policy or custom' that is actionable under <u>1983.</u> "Id. (quoting Canton<u>, 489 U.S. at 388).</u> And "'deliberate and difference' is a stringent standard of fault, requiring proof that a municipal actor unknown or obvious consequence of his action. "Bd. Of cnty. Comm'rs of Bryan Cnty. V. Brown, 520 U.S. 397,410(1997).

Dispatch recording continues (**Dispatch recording 20.07.19**) Notes Aviation response to dispatches request to follow a vehicle not stopping, dispatch briefs aviation pilots on the situation. **(Timestamp 00:14-00:23)** Dispatch advises aviation that officers <u>were</u> in pursuit but they are not at the moment. **(Timestamp 00:24-00:35)** Officer Stuckey interrupts and states that He was following a vehicle failing to stop and that he is trying to get back to the station. He states that the vehicle is still in front of him and that he is not following the vehicle and that the Plaintiff is driving normal speeds on Ed temple Blvd and Buchanan Street. Recording continues (**Dispatch recording 20.09.52**) Aviation asks for the vehicle's location, Officer Stuckey replies with the Vehicles location. (**Dispatch recording 20.10.21**) Ignoring previous directions from Sergeant Eaton to stop the pursuit of Plaintiff Abbey's vehicle, Officer Stuckey and Aviation continue to follow Plaintiff. (**Dispatch recording 20.11.02**) Officers are still behind plaintiff without probable cause or reasonable articulable suspicion stated. According to **Tennessee Code Ann. § 39-16-402** This is **<u>Official misconduct or harassment (a) A public servant commits an offense who, with intent to obtain a benefit or to harm another, intentionally or knowingly: (1) Commits an act relating to the public servant's office or employment that constitutes an unauthorized exercise of official power.</u>** (**Dispatch recording 20.11.53**) **(Timestamp 00:14-00:19)** Officer Stuckey replied that he is still behind plaintiff's vehicle at the stop light of Db Todd and Jefferson Street. Aviation replies that they are located on Meharry street. Officer Stuckey continues to give aviation plaintiff's location as he continues to follow Plaintiff Abbey. (**Dispatch recording 20.12.47**) **(Timestamp 00:19-00:26)** Officer Stuckey verifies that he is located behind plaintiff stating that They are located on Hermosa Street and 21st avenue north and that Aviation should see Officer Stuckey's partner Marcus Mitchell's Flashlight in the sky. This act signifies that the officers didn't have emergency lights on nor did they attempt to signal Plaintiff Abbey to stop. In fact, Officer Stuckey and Officer Mitchell were sitting behind Plaintiff on the street of Hermosa and 21st Avenue north. See (**Exhibit B: The Cad report of Metropolitan police**) See

**(Exhibit C: Map of streets where Plaintiff was followed through, map of location of Ralph ward's arrest and Andrea Miller in comparison to the area Plaintiff was arrested)** This is an act of harassment.

Sergeant Eaton was aware that Plaintiff Abbey was still being followed by Officer Stuckey yet the pursuit continued. When plaintiff was apprehended there were four Officers that showed up on the scene, One of the Officers was Sergeant Eaton who advised officer Stuckey to stop pursuing Plaintiff during the previous call between Stuckey and dispatch. To demonstrate deliberate indifference, a plaintiff must show that" in light of the duties assigned to specific officers or employees, need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need". World Wide St. Preachers Fellowship V. Town of Columbia, 591 F.3d 747,756 (5th Cir. 2009)) (quoting Canton, 489 U. S. at 390). "A less stringent standard of fault for a failure-to-[act] claim 'would result in de facto respondent *superior* liability on municipalities....'" Connick, 563 U.S. at 62(quoting Canton, 489 U.S. at 392). Officer Eaton was formally aware that Plaintiff Abbey didn't commit any crime but a felony takedown was still conducted by his Officers Terrance Stuckey and Marcus Mitchell. Officer Eaton has the authority to stop the pursuit but he continued to allow the pursuit and arrest to transpire. Plaintiff Abbey was not asked for any identification during her arrest (**Exhibit D: Is Plaintiff Abbey's original case number: Case Number: *GS897140 at the time of her arrest which shows a different name, her arrest was made under Naya Klugh). (Exhibit B: Is the CAD Report as mentioned above which shows All officers involved along with the time of dispatched and arrival times.) (Exhibit E: Is the Affidavit written by officer Stuckey)** that was written by Officer Stuckey during the arrest of plaintiff Abbey. No probable cause was mentioned in the CAD or Affidavit.

In Plaintiff's amended complaint against MNPD on paragraph 9, Plaintiff mentions a case similar to her own. The case of Ralph Ward and MNPD officers. On the night of November 14, 2019. Four months to the date of plaintiff's own arrest Mr. Ralph Ward was arrested by the same officer in the same area where plaintiff was arrested See (**Exhibit C: Map of location of Mr. Ward arrest**) Mr. Ward's arrest he was followed without his knowledge until he made a stop before heading home. Mr. Ward was arrested by the same officer Terrance Stuckey who claimed that Mr. ward was Evading arrest from a traffic stop. Citing Case NO. 3:20-cv-00981. Ward v. Reynolds et al The night of Mr. Ward's arrest Metropolitan Nashville Police Department ("MNPD") team was conducting surveillance of a suspected "dope party" at a Days Inn room. They had been tracking a Black Nissan all day for a suspect who was wanted for homicide. They tracked the black Nissan until they lost the location of the Vehicle on Briley Pkwy East. There was a second MNPD team called to back up the original team that started the surveillance of the Black Nissan. Officer Terrance Stuckey was part of that back up team. The backup MNPD team misidentified Mr. Ward driving down Briley in a Red Hybrid Lexus and named him as the target. The MNPD team followed Mr. Ward without his knowledge. Officers never attempted to turn on emergency lights nor did they signal Mr. Ward to stop, but continued to follow behind Mr. Ward stealth throughout the pursuit. During the call to dispatch that the backup MNPD team made while in pursuit of the red Lexus one of the officers of the original team spoke up and stated that the target was a black Nissan not a red Lexus. Ignoring the information, the back up team continued to follow the red Lexus that Mr. Ward was driving to a liquor store on Jefferson Street to R& R liquors. Mr. Ward exit the vehicle and walked into the store. As he was walking in officers tackled him down and conducted a felony takedown without probable cause of a crime. When Mr. Ward asked why he was being arrested he was told it was for Felony evading arrest. Again, in Citing Obstruction **of Justice 39-16-603 - Evading arrest Subsection (b)**

**(1) It is unlawful for any person, while operating a vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop.** According to the facts stated in Plaintiff's opposition, citing Monell **v. Department of Soc. Svcs., 436 U.S. 658 (1978) Under the Monell doctrine, a municipality may be held liable for an officer's actions when the plaintiff establishes the officer violated their constitutional right, and that violation resulted from an official municipal policy, an unofficial custom, or because the municipality was deliberately indifferent in a failure to train or supervise the officer**

   In the cases of Plaintiff Abbey and Mr. Ralph Ward shows evidence of MNPD's obvious indifference towards proper training and supervision of their employees. These acts of harassment, illegal seizure, illegal search and detainment of citizens without probable cause is a violation of citizens rights. These cases show no corrective action have been taken to ensure proper protocol for the crime of evading arrest, it also shows that an evading arrest claim can be made by an MNPD officer without evidence that a crime has been committed. It also signifies that if there was corrective action for these violations of citizens' rights, these violations wouldn't happened. It's no coincidence that these violations are being committed by the same Officers from the same precinct in both cases.

In Plaintiff's amended complaint against The Nashville Metropolitan Government on Paragraph 2 plaintiff states that at her preliminary hearing Officer Stuckey testified against plaintiff (**Exhibit F: The preliminary recording: As follows**) Where Officer Stuckey took the stand as a witness to Plaintiff's Arrest. Officer Stuckey starts his testimony by quoting the written statements on his affidavit giving vague details of the pursuit. (**Timestamp 00:01-01:13**). After Stuckey finished giving his statements the D.A. began his questioning (**Timestamp 01:17-01:35**) Officer Stuckey was asked what time of day or night was it he replied that it was 9:00 pm at night. Officer Stuckey was asked what type of vehicle was he driving? Officer Stuckey stated that he was driving a blue unmarked car with blue lights surrounding it. (**Timestamp 01:36-01:43**) Stuckey was then asked how many times did he try to stop the Plaintiff's vehicle? Stuckey replied by falsifying the events by stating that he tried "3 times, the first time at Clarksville Pike and 25th avenue north". Officer Stuckey was then asked how far was he when he got behind Plaintiff Abbey and activated his emergency equipment? (**Timestamp 01:44-02:46**). Officer replied that the first time he tried to stop the vehicle he attempted to stop plaintiff at 21st and Clarksville Pike. Officer Stuckey was then asked was he immediately behind the vehicle the whole time? Stuckey replied "yes, I was immediately behind the vehicle, that's when the vehicle stopped". Stuckey continued "that's when I followed the vehicle again to see what was the issue and the vehicle kept going towards Clarksville and DB Todd". He continues to state that Plaintiff stops at the light of DB Todd for a red light, Officer states that he turns on his emergency lights for a third time and Plaintiff Abbey runs through the red light almost hitting a pedestrian.

   (**Timestamp 03:56-04:40**) The D.A finishes his questioning and Plaintiff's public defender Chase Gober starts his cross examination of Officer Stuckey. During Chase Gober's cross examination of Officer Stuckey (**Timestamp 04:39-06:30**) Officer Stuckey was asked when did he turn on his emergency lights? Stuckey replied "I can't recall I say probably 10 seconds ". Officer was then asked in what direction was he following Plaintiff? (**Timestamp 06:32-06:56**) At this point of the preliminary hearing Officer Stuckey continues to falsify the event of the pursuit. Officer Stuckey states that he turned on his siren once plaintiff stopped at a red light of the intersection of DB Todd and Buchanan. Stuckey States that when he

turned on his siren that Plaintiff took off "Again" fleeing from the intersection of Db Todd and Buchanan Street almost hitting a pedestrian crossing the road.

**(Timestamp 07:05-07:43)** Officer Stuckey was asked when you turned on your siren did, you leave it on? Stuckey replied "No that it was no reason to run his siren continuously". Stuckey states he only briefly turned his siren on to alert plaintiff that police were behind her". **(Timestamp 7:43-08:59)** Officer was then asked at what speeds was the plaintiff traveling? Stuckey Replied "we were riding normal speed limit". Gober asked for clarification of the speeds that plaintiff was driving. Stuckey replied "30 Miles per hour". Gober asked **(Timestamp 08:00-08:17)** Officer was asked did he have his emergency lights on continuously? Stuckey Replied "Yes, that's when I cut them off when we got to a corner by a store trying to see if she would stop for a red light, she stopped at the red light. I turned my lights on again and honk my siren she takes off and almost hit somebody". **(Timestamp 08:39-09:18)** Gober asked Stuckey, "when you say she took off through the red light" Stuckey interrupts and says "she ran the red light, the light did not turn green." Gober asked did plaintiff's speeds increase? Stuckey stated "Yes her speeds increased". He was then asked how high did plaintiff speeds increase? Officer Stuckey replied "Well at that time she almost hit a pedestrian I backed off because I didn't know if she was trying to pretty much just run away from me or I don't know if she was just scared. But pretty much if you're in a situation where a suspect almost hits somebody you want to back off, so I backed off". **(Time stamp 09:19-10:49)** Chase Gober moves on to his next line of questioning "ok let's talk about the pedestrian". Gober asked what direction was the pedestrian coming from (**Exhibit G: is a map of the intersection of Db Todd and Buchannan Street**), (the red dot on the map signifies where the plaintiff car was position and where the green dot shows where "the pedestrian" was walking from). Stuckey stated the pedestrian was walking from the right side of plaintiff' vehicle in front of plaintiff. Gober asked so it is your testimony today that Abbey ran the red light? Stuckey replied "yes". Stuckey was then asked was there traffic at the time? Stuckey Replied "Yes it was traffic". Gober asked so you stayed behind Plaintiff but you didn't run the red light? Stuckey replied "NO". Stuckey was asked so when the light turns green you continued to follow where she is, do you ever lose sight of her? Stuckey replied "Not really she went straight up the hill of DB Todd toward Jefferson". Stuckey continued I just follow her lights when she just stopped, I'm right behind her still at the intersection of DB Todd and Jefferson Street, I don t think she knew I was behind her. But I was right behind her". **(Timestamp 10:43-12:15)** Gober asked so she stopped at a red light again? Stuckey replied "Yes, she stopped at a red light again". Gober asked so how far is this distance that your traveling? Stuckey replies "like I said from the beginning I tried to stop her at Clarksville and 25th cut my lights on, when I cut my lights on, she took off. She stops at the intersection of Buchannan and DB Todd I cut my lights on again then she took off, at that time the light was turning green when she took off but it was red. When she took off a person was walking across the street, she almost struck that person. I backed off, I called for aviation. Aviation picked up and saw the vehicle when I was behind the vehicle at DB Todd and Jefferson. At that time, I just followed the vehicle and aviation was giving me the directions of the vehicle as I was going, I'm right behind the vehicle when she stopped again turning on 21st and Albion. I cut my blue lights on again and she took off again. Then we got to the intersection of 21st and Meharry cut my blue lights on again she took off again. At that time, she got to the intersection of 21st and Jefferson where oncoming traffic was coming inbound and outbound and she couldn't really run. She parked her car and that's when me and my partner conducted a felony take down while aviation was above the vehicle". **(Timestamp 14:32-15:45)** Gober Stated "upon reviewing the affidavit I noticed that the warrant doesn't say anything about why you were initially stopping Abbey, did you have a chance to look at it earlier today?" Stuckey replied "Yes, sir "Gober

continues "Well its just says you attempted to stop suspects' vehicle and the location but not why you stopped her why is that? Stuckey replied "Well it's the reason I just told you, I typed up the warrant I gave you my testimony, if you want the reason why I stopped and the tag number you can get that information from CAD" Gober replied "well I'm asking why didn't you put it in the warrant you wrote?" Officer Stuckey never gave an answer to why he conducted a felony arrest of Plaintiff Abbey. Officer Mention an expired tag, but having an expired tag is a class C misdemeanor.

These recordings are evidence that Officer Stuckey took affirmative steps to encourage or influence the prosecution of Plaintiff by covering up for his and his supervisor's egregious acts by committing Perjury during her preliminary hearing. Officer's testimony violates the Plaintiff's **right to due process** which then violates Plaintiff's Fourth and Sixth Amendment Right. MNPD initiated the prosecution of Plaintiff by filing the General Sessions charges against her on August 14, 2019.Officer Stuckey knew that his allegations were false. Id., citing Meeks v. Larsen, 611 F. App'x 277, 282 (6th Cir. 2015) ("There is an exception to [the general rule regarding the preclusive effect of grand jury indictments] when the defendants knowingly presented false testimony to the grand jury to obtain the indictment . . . or testified with reckless disregard for the truth."). Plaintiff Abbey and Ralph Ward weren't the only complaints brought against this particular MNPD department and their officers. Citing **Miller V Maddox Case No. 3:13-cv-01270**, In this case MNPD Officers accused Ms. Miller for Reckless Driving, Evading Arrest in a Motor Vehicle, and Resisting Arrest, MNPD arrested MS. Miller in the area of Baldwin Court near Bordeaux area, this is 13 Minutes from the area where Plaintiff Abbey and Mr. Ward arrest were conducted See (**Exhibit C**). The MNPD Officers arrested Ms. Miller giving no probable cause as to what crime Ms. Miller committed and intentionally swore out demonstrably false affidavits resulting in her being booked into jail, where she was incarcerated for three or four hours, before being released on "pretrial release"; and falsely testified at her preliminary hearing. It is clear that from the review of (Exabit A-F) shows that officer Stuckey didn't have probable cause as to why he arrest plaintiff. Just like in the arrest of Mr. Ward and Ms. Miller they both were followed by MNPD and arrested for evading from a traffic stop without probable cause. Plaintiff has shown where this is not a onetime incident, but a common practice. The arrest of Mr. Ward and Ms. Miller proves that officers at this department under the supervision of sergeants and lieutenants commit false arrest, harassment, illegal search and seizure of citizens. This MNPD supervisors/sergeants are aware of officers following citizens stealth for several minutes and commonly preforming false arrest under the crime of evading arrest where no probable cause is stated and they are allowed to commit perjury under oath without consequence to influence charges against citizens. This is an obvious obstruction of law. Thus, proves inadequate supervision of employees and subpar training in result of violation of citizens' rights. While a "single incident can give rise to municipal liability," it can do so "only if the municipal actor who committed the constitutional violation 'is a final policymaker.'" medina, 623 Fed. App. At 700 (quoting Valle V. City of Houston, 613F.3d 536, 542 (5th Cir. 2010)). "Because the 'standard for [municipal] employee is ordinarily' required show a pattern of abuses that transcends the error made in a single case." Piotrowski, 237 F.3d at 582 (citing Bryan Cnty., 520 U.S.at 410-11). Thus, relief is typically unavailable "absent a showing of a pattern of constitutional violations, as opposed to a single incident." Parker, 23 F4th 525. "A pattern could evidence not only the existence of a policy but also official deliberate indifference. "Piotrowski, 237F.3d at 582.

Plaintiff filed her Amended Complaint in this Sixth Amendment right of speedy trial action pursuant to 42 U.S.C. § 1983, alleging, inter alia, that Defendant: (1) Delay of plaintiff's trial (2) Abrupt motion of retirement of plaintiff's charges without a fair hearing and proper dismissal for charges being time barred. (3) Deprivation of her liberty, charges against her resulted in the deprivation of her liberty, as she was taken into custody, jailed, forced to comply with her conditions of pretrial release and had to attend numerous court dates defending her case (4) Economic damages resulting from charges pending for a prolonged amount of time.

On August 24, 2022 (plaintiff's pre-trial hearing), two weeks before Plaintiff's trial. Plaintiff's case was retired and then later dismissed on September 7,2022. During that time Plaintiff was represented by Attorney Jefre S Goldtrap who did not appear at plaintiff's pretrial hearing, Mr. Goldtrap had motion to be relieved from plaintiff's case on July 19 2022. Mr. Goldtrap was obligated to make an appearance so that his motion could be implemented See (**Exhibit H: emails between plaintiff Abbey and Mr. Goldtrap discussion of the Motion for relief**). After spending hours waiting for Mr. Goldtrap to appear to court Plaintiff was informed by the courts that her attorney wasn't there and that they had no updates on Mr. Goldtrap's whereabouts. Plaintiff's pre-trial hearing still proceeded without her attorney present (As mentioned in Plaintiff's amended complaint paragraph 6). Plaintiff was called to approach the podium and was allowed to briefly speak about her concerns of her representation. As plaintiff was speaking to the judge The D.A. assigned to plaintiff's case motion for retirement of plaintiff Abbey's case with the conditions of an 11/29.

If Plaintiff successfully complied with the conditions Plaintiff would have a chance to get her case dismissed completely. This motion came month after plaintiff retrieve dispatch recordings disproving the testimony of Officer Stuckey. Official misconduct or harassment (a) A public servant commits an offense who, with intent to obtain a benefit or to harm another, intentionally or knowingly: (1) Commits an act relating to the public servant's office or employment that constitutes an unauthorized exercise of official power. Citing **Procedural Due Process Civil** SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. It is a violation of due process for a state to enforce a judgment against a party to a proceeding without having given him an opportunity to be heard sometime before final judgment is entered. The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. 4 Similarly, the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to . . . a speedy public trial." Tenn. Const. Art. I, § 9; see also Tenn. Code Ann. § 40-14- 101("In all criminal prosecutions, the accused is entitled to a speedy trial....").

The speedy trial guarantee is designed to protect the accused from oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that the accused's defense will be impaired by dimming memories or lost evidence. See Doggett v. United States, 505 U.S. 647, 654, 112 S. Ct. 2686, 2692, 120 L. Ed.2d 520 (1992); State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). Both the federal and state constitutional provisions apply, by their own terms, to persons "accused" in a "criminal prosecution." Therefore, these constitutional rights are implicated only when there is an arrest or a formal accusation. See Utley, 956 S.W.2d at 491. In Barker, supra, the Supreme Court enunciated the following four-factor balancing test for courts to apply when evaluating a speedy trial claim: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) the prejudice suffered by the defendant from the delay. Barker, 407 U.S. at 530, 92 S. Ct. at 2192. This Court

adopted the Barker analysis in State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973), and we have applied it in subsequent cases. See, e.g. Utley, 956 S.W.2d at 492; State v. Wood, 924 S.W.2d 342 (Tenn. 1996

    Plaintiff waited Three years after her preliminary hearing to receive a final pre-trial hearing and trial date (original trial date November 29,2021) Plaintiff's trial was rescheduled before she made an appearance to court, her trial was rescheduled for September 7,2022 nearly a year after the original date. Plaintiff's charges were two Class E felonies one for evading arrest and one reckless endangerment charge. Citing **Tenn. Code § 40-2-101 (a) A person may be prosecuted, tried and punished for an offense punishable with death or by imprisonment in the penitentiary during life, at any time after the offense is committed. (b) Prosecution for a felony offense shall begin within:(1) Fifteen (15) years for a Class A felony;(2) Eight (8) years for a Class B felony;(3) Four (4) years for a Class C or Class D felony; and (4) Two (2) years for a Class E felony.** Clearly the statutes of limitation barred the prosecution to proceed with the charges that Plaintiff was accused of. Since the case was time barred Plaintiff's case should have been dismissed completely, instead Plaintiff's case was retired. Citing **TN Code § 40-14-101 (2021) In all criminal prosecutions, the accused is entitled to a speedy trial and to be heard in person and by counsel**. This caused plaintiff to be deprived of her liberties due to the conditions of the Pretrial services program which is a 6-to-2-year program. In plaintiff's case this program lasted three years so did the conditions thereof. Even though the statues of limitations for the prosecution of a class E felony is two years. Plaintiff's case was rescheduled up to 16 times during the process of her prosecution. As mentioned in paragraph 4 of Plaintiff's Amended complaint. See (**Exhibit I: emails from Attorney Jefre S Goldtrap for upcoming court events**) See (**Exhibit J: Plaintiff's final court appearances after original dates were rescheduled**). Plaintiff was forced to attend court eight different court dates which were rescheduled 8 different times. Plaintiff was assigned 16 different court dates during the time leading up to plaintiff's final trial date. Plaintiff was offered a plea deal each time she made an appearance at court. Every time she was offered a plea Plaintiff would deny the plea and request a trial date. Every time she denied the plea the court would reschedule Plaintiff Abbey's court date as stated in Paragraph 5 of plaintiff's amended complaint. Plaintiff was promised each time she was rescheduled for another court appearance that the new date given was going to be a trial held for her, no trial was ever held for Plaintiff. Citing Case, No 3:20-cv-00981 RALPH WARD, Plaintiff, v. KEVIN REYNOLDS, et al., Defendants. In Mr. Ward's case his charges were dismissed in June 2020 as stated in Plaintiff's amended complaint on paragraph 9. Plaintiffs was arrested four months before Mr. Ward. Below is a list of the dates Plaintiff's case was rescheduled for court.

<u>Three Arraignment dates:</u>
07/08/2020 Plaintiff appeared to court
08/12/2020 Rescheduled
08/18/2020 Plaintiff appeared to court.
<u>Three Discussion dates:</u>
06/03/2021 Plaintiff appeared to court
07/15/2021 Plaintiff appeared to court
11/07/2021 Rescheduled
<u>Three status conferences:</u>
10/13/2021 Plaintiff appeared to court
11/17/2021 Plaintiff appeared to court
08/10/2022 Rescheduled
<u>four court dates:</u>
10/08/2020 Rescheduled
11/10/2021 Rescheduled
11/17/2021 Plaintiff appeared to court

03/14/2022 Rescheduled
Three trials
11/29/2021 Rescheduled
09/07/2022 Dismissed
09/12/2022 Dismissed
During plaintiff's pre-trial hearing she was deprived of her right to be heard Instead she was giving a mediocre judgment and was sent on her way. Plaintiff was also denied the right to liberty due to pending criminal charges. During the time of January 2020- August 2022 Plaintiff had two pending felony charges under her name which made her an unsuitable candidate for employers See (**Exhibit K: Adverse actions from employers to Plaintiff for employment**) Because Plaintiff's charges went unresolved for three years it caused a drastic decline in plaintiff's quality of life because Plaintiff was unable to obtain employment to sustain herself and her child. Before Plaintiff's arrest Plaintiff worked for Cigna as a Member services senor care Manager Plaintiff was responsible for helping people below the poverty line obtain affordable health insurance and helped the elderly and the disabled with the up keep of their health by scheduling health screenings and in home nurse visits. After Plaintiff's arrest, Plaintiff lost her employment with Cigna and was forced to work odd jobs to make ends meet. Plaintiff still to this day has not recovered employment. Before Plaintiff's arrest Plaintiff's yearly salary was $56,000.00 with the opportunity of advancement with a salary rise of $100,000.00. Due to pending charges plaintiff also missed out on other employment opportunities ranging from yearly salaries of $60,000.00 with advancements in pay up to $120,000.00 yearly. Since plaintiff was unable to obtain employment Plaintiff lost her housing and lost other opportunities for housing. Because Plaintiff wasn't an ideal tenant due to her pending felonies and lack of income plaintiff was consistently denied housing. See (**Exhibit L: Emails from non-profit organizations for help with homelessness**). In February 2020 of the following year after plaintiff Abbey's preliminary hearing plaintiff became completely homeless, Since Plaintiff couldn't provide shelter for herself, Plaintiff was forced to send her 9-year-old son to live with his father. Plaintiff Abbey's son has been living with his father since March 2020, because of plaintiff's financial conditions she hasn't seen her son since December 2021. Plaintiff's son David is now 13 years old. Plaintiff Abbey's son has developed behavioral issue stemming from abandonment due to separation from his mother. See (**Exhibit M: sworn statement from Plaintiff's child's Father Justin J Hernandez**) On December 17, 2019, 13 days after Plaintiff's preliminary hearing plaintiff suffered a miscarriage due to stress from facing criminal charges that were brought on her without probable cause See (**Exhibit N: Plaintiff's Medical records from 12/20/2019**). In August 2021 Plaintiff suffer a loss of another child due to complications with her health and financial hardships cause plaintiff to not receive adequate pre-natal care that she needed to care for herself during pregnancy, Plaintiff lacked the means of proper nutrition, transportation to and from doctors' visits and suffered from depression and anxiety awaiting her trial. See (**Exhibit O: Plaintiff's Daughter's Death Certificate**). Plaintiff still is facing homelessness at this point in time Plaintiff lives in a boarding house where she is currently being evicted due to lack of employment see (**Exhibit P: Eviction notice**) Because of the three year- four year work gap plaintiff is still unable to obtain the employment needed to sustain herself and her child. In 1978, in Monell vs. New York City Department of Social Services, the U.S. Supreme Court held for the first time that a municipal corporation may be held liable when it implements or executes a formal policy statement, ordinance, regulation, or official decision that results in a constitutional deprivation.
Abstract
Moreover, it held that a municipality also may be held liable for constitutional deprivations caused by governmental custom. This holding imposes liability upon an employer for the wrongful actions of an employee, regardless of the absence of fault by the employer. In subsequent decisions, the Court has expressed divergent opinions on what constitutes 'custom' or inadequate supervision and training necessary to establish liability. Some justices would permit a finding of custom based on a single

incident of unconstitutional conduct, others would require a showing of deliberate indifference to a past pattern of misconduct, while other would require a showing of gross negligence.

## Conclusion

Notably, "The Plaintiff must plead facts sufficient to show the municipality was 'deliberately indifferent' to obvious need [to act]." Culbertson, 790 F.3d at 625(quoting Peterson v. City of Fort Worth, 588 F.3d 838,849-50 (5th Cir. 2009)). The alleged "infringement of the Plaintiff's constitutional rights must be an 'obvious' and 'highly predictable' consequence of the failure to [act]." Parker, 23 F4th at 525(quoting Culbertson, 790 F. 3d at 625). As started in Peterson, a "failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on the accounts of novices in [their respective field]." 588 F. 3d at 849 (discussing novices in law enforcement). The same is true when there is deliberate indifference to an obvious need for supervision or discipline where citizens are likely to lose their constitutional rights on account of unsupervised or undisciplined municipal employees. While a "single incident can give rise to municipal liability, "it can do so " only if the municipal actor who committed the constitutional violation 'is a final policy maker. '" Medina, 623 Fed. Approx. 700 (quoting Valle V. City of Houston, 613 F. 3d 536, 542 (5th Cir.2010)). "Because the 'standard for [municipal] fault' is a
'stringent' one, '[a] pattern of similar constitutional violations by untrained employees is ordinarily 'required to show deliberate indifference." Pena, 879 F. 3d at 623 (quoting Connick, 563 U.S. at 62). The same can be said about unsupervised municipal employees. Similarly, it is nearly impossible to impute lax disciplinary policy to [a municipality] without showing a pattern of abuse that transcends the error made in a single case" Piotrowski, 237 F. 3d at 582 (citing Bryan Cnty., 520 U.S. at 410-11). Thus, relief is typically unavailable "absence a showing of a pattern of constitutional violations, as opposed to a single incident."Paker,23 F4th 525." A pattern could evidence not only the existence of a policy but also an official deliberate and difference." Piotrowski, 237 F.3d at 582.

For the foregoing reasons and all the others discussed in Plaintiff's Complaint, the present Motion to Dismiss should be denied.

Naya Abbey
45 Edison St
Pontiac MI 48342
(615) 294-5095
Ihavethevictorynow@gmail.com

Date 9/5/2023


