UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| NAYA L. ABBEY, et al., | ) |
| --- | --- |
| Plaintiffs, | ) |
| v. | ) No. 3:23-cv-00300 |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiffs Naya L. Abbey ("Abbey") and D.H., a minor by and through his parents and next of kin Justin Hernandez and Abbey ("D.H."), bring suit against the Metropolitan Government of Nashville and Davidson County ("Metro"), Officer Terrance D. Stuckey ("Officer Stuckey") in his individual capacity, and John Doe 1 (collectively, "Defendants").[1] (Doc. No. 42). This case arises out of Defendants' alleged mistreatment of Abbey and D.H. during a traffic stop that resulted in Officer Stuckey allegedly forcefully arresting Abbey, searching her car, and threatening to place D.H. into Child Protective Services ("CPS") custody. From those events, Abbey and D.H. brought claims for Fourth and Fourteenth Amendments violations under 42 U.S.C. § 1983 ("§ 1983")

---

[1] In the Amended Complaint (Doc. No. 42), Abbey and D.H. fail to name the Metropolitan Nashville Police Department ("MNPD"), the Metropolitan Nashville Tennessee, and the State of Tennessee as defendants, nor do they bring any claims or allegations against them. Despite this, these parties remain in the case because Abbey and D.H. named them in the original Complaint (Doc. No. 1). Because the operative Complaint is devoid of any indication that MNPD, the Metropolitan Nashville Tennessee, or the State of Tennessee are properly named in this matter, the Court will dismiss them *sua sponte* under Rule 21 for misjoinder. Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."); see Letherer v. Alger Grp., 328 F.3d 262, 267 (6th Cir. 2003), overruled on other grounds by Blackburn v. Oaktree Cap. Mgmt., 511 F.3d 633 (6th Cir. 2008).

against Defendants. Before the Court are Officer Stuckey's and Metro's Motions to Dismiss (Doc. Nos. 52, 54), which have been fully briefed and are ripe for review (Doc. Nos. 52–56, 58, 59). For the following reasons, the Court will grant Defendants' motions and will dismiss this case.

I.      BACKGROUND AND FACTUAL ALLEGATIONS[2]

The instant events arose while Abbey and D.H. moved homes in Nashville on August 14, 2019. (Doc. No. 42 ¶ 13). While moving their items to their new home, Abbey noticed a blue car following them on Hermosa Street, 21st Avenue North, and Meharry Boulevard. (Id. ¶¶ 15–18, 21). Eventually, the blue car engaged blue lights, prompting Abbey to come to a complete stop with her hazard lights engaged. (Id. ¶ 23).

Officer Stuckey and another man emerged from the blue car, with guns drawn, yelling for Abbey to exit the unmarked vehicle. (Id. ¶ 24). The two men forcibly removed Abbey from her vehicle at gunpoint, twisted her arms, handcuffed her, and placed her in the back of the unmarked blue car.[3] (Id. ¶¶ 33, 112). They informed Abbey that she was going to jail for felony reckless endangerment and evading arrest by refusing to stop when Officer Stuckey engaged his lights and sirens, and for almost hitting a citizen while refusing to stop her vehicle. (Id. ¶¶ 25–26, 28, 33). Officer Stuckey then searched Abbey's vehicle, and informed her that D.H. would be placed in CPS custody because she was going to jail. (Id. ¶¶ 34, 98). The two men then took Abbey to jail, where she was held for several hours before her release. (Id. ¶ 35).

---

[2] The Court draws the facts in this section from the Amended Complaint (Doc. No. 42) and assumes the truth of those facts for purposes of ruling on the instant motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

[3] According to Abbey, this event relates to a Metro Nashville Community Oversight Committee ("MNCO") report that, pursuant to a Metro policy requiring that officers document firearm displays, showed them using firearms and uses of force against Black individuals in the area at a higher rate than other members of the population. (Doc. No. 42 ¶¶ 36–40). Notably, Abbey's race is not referenced in the Amended Complaint.

2

At Abbey's preliminary hearing in criminal court, Officer Stuckey testified that he attempted many times, without avail, to stop Abbey by using his blue lights and sirens on the date of the incident. (Id. ¶¶ 43–46). Officer Stuckey further testified that he called for aviation to follow Abbey's vehicle until he was able to apprehend her. (Id. ¶ 47). Sometime after the preliminary hearing, the criminal case was stayed for three years. (Id. ¶ 48).

Eventually, on August 24, 2022, Abbey obtained the dispatch calls pertaining to her arrest. (Id. ¶ 49). The dispatch calls told a different story than the one Officer Stuckey described at the preliminary hearing years' prior. Instead of describing Officer Stuckey chasing Abbey through the streets of Nashville at various times throughout the night, the calls revealed that Officer Stuckey admitted that Abbey drove at normal speeds, and that he had not been in pursuit of her on multiple occasions. (Id. ¶ 50). Further, the State of Tennessee concluded that Officer Stuckey did not activate his lights or sirens at any point in time during his alleged pursuit. (Id. ¶ 51). Rather, Officer Stuckey activated his lights and sirens only immediately before pulling Abbey over. (Id.). Accordingly, the State of Tennessee dismissed the criminal actions against Abbey on September 2, 2022. (Id. ¶ 52).

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020) (quoting Fed. R. Civ. P. 8(a)(2)). When determining whether the complaint meets this standard, the Court must accept all the complaint's factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). The Court must determine only whether "the claimant is entitled to

3

offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). And "[w]hile the complaint 'does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions'" or "'a formulaic recitation of a cause of action's elements[.]'" Blackwell, 979 F.3d at 524 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

### III. ANALYSIS

Both Metro and Officer Stuckey move to dismiss the claims against them in their entirety pursuant to Rule 12(b)(6). (Doc. Nos. 53, 55). The Court will address each motion, by claim, below.

>  1. Counts I (Unlawful Seizure and False Arrest), II (Unreasonable Search), and III (Excessive Force)

The Court first turns to Defendants' primary Rule 12(b)(6) argument for dismissal: that Abbey's and D.H.'s § 1983 claims are barred by the applicable statute of limitations. See Jones v. Bock, 549 U.S. 199, 215 (2007) ("If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim[.]").

Section 1983 provides plaintiffs with a right to seek damages from any "person," who, while acting "under color of" state law, "subjects" the plaintiffs "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. While "this provision lacks its own statute of limitations," "[c]ourts have filled this gap with a mix of federal and state rules[,]" where "state law determines the *length* of § 1983's statute of limitations." Reguli v. Russ, 109 F.4th 874, 879 (6th Cir. 2024). Here, Abbey's and D.H.'s § 1983 claims borrow "the statute of limitations from Tennessee for personal-injury torts," which are one year. Dibrell v.

City of Knoxville, Tennessee, 984 F.3d 1156, 1161 (6th Cir. 2021) (citing Tenn. Code Ann. § 28-3-104(a)(1)(A)).[4]

"Although the statute of limitations turns on state law, the question of when a § 1983 claim accrues to trigger the statute turns on federal law." Id. at 1161–62 (citing Wallace v. Kato, 549 U.S. 384, 388 (2007)). The standard "accrual" rule is that a claim accrues "when the plaintiff has a complete and present cause of action" that can be raised in court. Rotkiske v. Klemm, 589 U.S. 8, 13 (2019) (citation and quotations omitted). "The Supreme Court has contrasted this 'standard' rule with a 'discovery' rule[.]" Dibrell, 984 F.3d at 1162. The Sixth Circuit has recently instructed that its precedent suggests, but does not definitively state, that § 1983 claims should follow the latter rule, which "postpones the limitations period to the date that the plaintiff discovered, or reasonably should have discovered, basic facts about the claim." Reguli, 109 F.4th at 879.

Applying this law, the parties agree on as much as they disagree. They agree that § 1983 "incorporates a one-year statute of limitations from Tennessee[,]" id. at 880, and that the crux of the events leading to the instant case occurred more than three years ago on August 14, 2019. However, they disagree on two key points: the proper rule to evaluate the statute of limitations timeframe under, and whether Officer Stuckey's release of his dispatch tapes on August 24, 2022 changes the applicable statute of limitations period here. Importantly, the answer to the former question does not change the outcome: under either the standard or discovery tests, Abbey's and D.H.'s § 1983 claims are time-barred.

---

[4] As the Sixth Circuit in Dibrell opined, "Tennessee has another statute of limitations for actions 'under the federal civil rights statutes.'" Dibrell, 984 F.3d at 1161 (quoting Tenn. Code Ann. § 28-3-104(a)(1)(B)). Like the Dibrell court, this Court need not consider whether that statute or the Tennessee torts statute applies, given both set a one-year period to bring claims. Id.

All of Abbey's and D.H.'s § 1983 claims have a statute of limitations that began to run from her arrest, the search of her car, and D.H.'s taking into CPS custody on August 14, 2019. The Court starts with Abbey's and D.H.'s false arrest/unlawful seizure claim. Under the standard test, "the limitations period for a claim involving false arrest [or unlawful seizure] would 'commence to run' from the date of the wrongful arrest [or seizure] because the plaintiff has a complete cause of action at that point." Dibrell, 984 F.3d at 1162. "And if the discovery rule were to apply, [Abbey's and D.H.'s] knowledge that [they] had been arrested [or seized] (allegedly wrongfully) would start the clock on the same date." Id. Under either approach, Abbey's arrest and D.H.'s unlawful seizure on August 14, 2019 would have triggered the statute of limitations on this claim, making any claim filed after August 14, 2020 untimely.[5] See id.

The same is true for Abbey's unreasonable search and excessive force claims. The statutes of limitations began to run on Abbey's claims when she knew of the illegal search, Wallace, 549 U.S. at 388, and when Officer Stuckey used the alleged excessive force against her, Fox v. Desoto, 489 F.3d 227, 233 (6th Cir. 2007), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009). Abbey alleges that Officer Stuckey informed her that his unlawful search of her vehicle occurred during the August 14, 2019 traffic stop, making her immediately aware of its occurrence. (See Doc. No. 42 ¶¶ 34, 105). She further alleges that she experienced the excessive force by Officer Stuckey when he removed her from her vehicle, forced her to the ground, twisted

---

[5] The same is true even if the Court looks "to accrual rules for the tort most like the constitutional claims at issue." Dibrell, 984 F.3d at 1162 (citation omitted). Indeed, even if the statute of limitations ends "when the false *imprisonment* ends with" Abbey's or D.H.'s release or "when the *false* imprisonment ends with the issuance of legal process," the allegations in the Amended Complaint demonstrate that both occurred in 2019. Id.;(see Doc. No. 42 ¶¶ 77–78 (stating that after preliminary hearing that occurred before December 20, 2019, Abbey sent D.H. to live with his father), ¶¶ 61–62 (stating in January 2020 that Abbey was no longer in custody), ¶ 69 (stating Abbey was homeless for two years after arrest)). Accordingly, even under these standards, Abbey's and D.H.'s false arrest/unlawful seizure claim remains untimely.

6

her arms, and restrained her in handcuffs during that same stop. (Id. ¶ 112). Under the standard test, Abbey would have had complete and present causes of action for unreasonable search and excessive force on the day of that stop. See Rotkiske, 589 U.S. at 13. Under the discovery test, the result is the same: Abbey discovered the pertinent facts about her unreasonable search and excessive force claims at the time of their occurrence on August 14, 2019 such that the claims accrued that day. See Reguli, 109 F.4th at 879. Because Abbey filed both claims years after the close of the statute of limitations timeframe on August 14, 2020, both are untimely.

Abbey's and D.H.'s argument that the statute of limitations on their claims was tolled throughout the course of Abbey's criminal proceedings, supported by Wolfe v. Perry, 412 F.3d 707 (6th Cir. 2005), is misguided. In Wolfe, the Sixth Circuit held that "the district court erred in finding that the statute of limitations began to run" at the time of the plaintiff's arrest for his Fourth Amendment claim. Id. at 714. In coming to that conclusion, the Wolfe panel found that the cause of action "'impl[ied] the invalidity of a conviction[,]'" and so it "'does not accrue until the conviction is reversed or expunged, and therefore the statute of limitations does not begin to run until such an event occurs, if ever.'" Id. (quoting Shamaeizadeh v. Cunigan, 182 F.3d 391, 394 (6th Cir. 1999) (abrogated by Wallace, 549 U.S. 384)). What Abbey ignores about Wolfe, however, is that the Supreme Court explicitly rejected this logic in the context applicable here.

In Wallace, the Supreme Court held that a claim for wrongful arrest under § 1983 accrues at the time of the arrest or, at latest, when detention without legal process ends, and that a claim for excessive force accrues at the time of the arrest. Id. at 388–89. In doing so, Wallace clarified that the equitable tolling of a statute of limitations, as described in Wolfe and Shamaeizadeh, only applies to *post*-conviction § 1983 claims, such as malicious prosecution. Id. at 393–94; see Fox, 489 F.3d at 233–35, abrogated on other grounds by Pearson, 555 U.S. at 227 (district court erred

7

in relying on Shamaeizadeh to extend statute of limitations to after close of criminal proceedings for Fourth Amendment claims); see also McCracken v. Wells Fargo Bank NA, 634 F. App'x 75, 79 (3d Cir. 2015) (relying on Wallace, holding that § 1983 false arrest claims accrue at the time of arraignment). Given the abrogation of Wolfe and related precedent, Abbey's and D.H.'s reliance on it here does little to save their otherwise time-barred Fourth and Fourteenth Amendment pre-conviction claims.

At bottom, Defendants are correct that the allegations establish that Abbey and D.H. filed their § 1983 false arrest/unlawful seizure, unreasonable search, and excessive force claims nearly three years too late on April 3, 2023. Accordingly, Defendants' motions will be granted on this ground, and Counts I through III will be dismissed.

2. Fourteenth Amendment Brady Claim

Metro next challenges the sufficiency of what it interprets Abbey to plead as a Fourteenth Amendment Brady violation. The Court questions the necessity of this argument, given it is not evident that Abbey pleads this claim in the Amended Complaint. (See Doc. No. 42 (stating the three § 1983 claims above and a municipal liability claim)). However, given that Abbey contests Metro's motion, and that there are some allegations in the Amended Complaint that could be interpreted to raise such a claim, the Court will address this issue on the merits.

"Brady v. Maryland familiarly holds that prosecutors must turn over favorable evidence to the accused when the evidence is material either to guilt or punishment; wrongful withholding is a violation of the right to due process" under the Fourteenth Amendment. Robertson v. Lucas, 753 F.3d 606, 620 (6th Cir. 2014) (citing Brady v. Maryland, 373 U.S. 83, 89 (1963)). "There are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been

8

Case 3:23-cv-00300   Document 69   Filed 07/09/25   Page 8 of 14 PageID #: 408

suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999).

Metro argues dismissal is warranted because the allegations conclusively establish that the second factor, that Metro suppressed evidence, is not properly alleged. Specifically, Metro contends that the allegations stating that Abbey received the exculpatory evidence, Officer Stuckey's dispatch tapes, prior to trial demonstrates that Metro did not suppress them. Abbey disagrees, arguing that Metro's three-year delay in providing Abbey with those tapes supports her alleged Brady violation. While the Court understands Abbey's gripes with the length of time she waited to receive the tapes that exculpated her of the criminal charges brought against her, Metro is correct that the alleged circumstances do not arise to the level of a sufficiently pled Brady violation.

As alleged, in July 2022, Abbey lived with a friend "in the months leading up to her trial." (Doc. No. 42 ¶ 72). From this, the Court can infer that Abbey's criminal trial was set for after July 2022. Abbey alleges that the next month, Metro disclosed Officer Stuckey's tapes to her, which resulted in the criminal charges against her being dropped by the State of Tennessee on September 2, 2022. (Id. ¶¶ 49–52). Taking these allegations as true and in Abbey's favor, they demonstrate that Metro did not suppress Officer Stuckey's dispatch tapes from her. Critically, Metro disclosed Officer Stuckey's dispatch tapes to Abbey in August with sufficient time for her to "effective[ly] use" them "at trial." United States v. Presser, 844 F.2d 1275, 1283 (6th Cir. 1988). What's more, these facts demonstrate that the disclosure did not "so prejudice[] [Abbey] that [s]he was prevented from receiving h[er] constitutionally guaranteed fair trial," given the State of Tennessee elected not to proceed with *any* trial against her after Metro disclosed the exculpatory evidence. United States v. Farley, 2 F.3d 645, 654 (6th Cir. 1993) (citing Presser, 844 F.2d at 1282); see United

9

Case 3:23-cv-00300    Document 69    Filed 07/09/25    Page 9 of 14 PageID #: 409

States v. Garner, 507 F.3d 399, 405 (6th Cir. 2007) ("If previously undisclosed evidence is disclosed *during* trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure.") (citation and quotations omitted) (emphasis added).

Given these circumstances—where Abbey received the exculpatory evidence from Metro prior to trial, and thus did not need to stand trial for the criminal charges against her—Abbey has failed to allege the second element of her Brady violation. Accordingly, Metro's motion on this issue will be granted, and Abbey's Brady claim will be dismissed.

    3. Count IV (Municipal Liability)

Finally, Metro challenges Abbey's and D.H.'s municipal liability claim brought against it under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). "To prevail in a § 1983 suit against a municipality," like the claim Abbey and D.H. bring against Metro here, "a plaintiff must show that [(1)] the alleged federal right violation occurred [(2)] because of a municipal policy or custom." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005) (citing Monell, 436 U.S. at 694). This is because a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell, 436 U.S. at 694. The first prong of this claim poses problems for Abbey and D.H., given the Court has concluded that all of the purported constitutional violations Abbey and D.H. suffered are either time-barred or otherwise insufficiently pled. See supra, Sections III.1, III.2. Nevertheless, because Metro ignores this part of the municipal liability analysis in its papers with respect to Counts I through III, the Court must consider the second prong of the analysis further.[6] (See Doc. No. 53 at 7–9 (arguing allegations on second prong are deficient)).

---

[6] Metro does successfully argue that the first prong of the municipal liability claim related to the alleged Brady violation fails. (See Doc. No. 42 ¶ 119 (alleging that Metro failed to provide Abbey and D.H. with exculpatory evidence to support municipal liability claim); Doc. No. 53 at 7

On that prong, "[t]here are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." Thomas, 398. F.3d at 429. "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Id. (citations omitted). Here, Abbey and D.H. allege the first, third, and fourth: that Metro had an official policy, practice, or custom of "violating the rights of its citizens while not following their own policies and procedures," and a practice of "failing to train its officers on constitutional violations." (Doc. No. 42 ¶¶ 117–18).

The Court starts with Abbey's and D.H.'s first theory of municipal liability—that Metro systematically violated citizens' rights. To the extent Abbey and D.H. seek to assert that Metro did this through an "official policy," this "'often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986). If instead Abbey and D.H. seek to prove this violation as a "custom" of Metro's, "[a] 'custom' for the purposes of Monell liability must be 'so permanent and well settled as to constitute a custom or usage with the force of law[,]'" Doe v. Claiborne Cnty., 103 F.3d 495, 507 (6th Cir. 1996) (quoting Monell, 436 U.S. at 691), and "must reflect a course of action deliberately chosen from among various alternatives." Id. (citing City of Oklahoma v. Tuttle, 471 U.S. 808, 823 (1985)).

---

(asserting that Abbey's Fourteenth Amendment Brady claim failing requires the dismissal of her related municipal liability claim)). Accordingly, the Court finds that the municipal liability argument based on that purported constitutional violation is unsupported and need not consider it further here.

11

Regardless of how the Court characterizes Abbey's and D.H.'s theory of liability here, it agrees with Metro that it is insufficiently pled to properly support a Monell claim. As Metro argues, the allegations pertaining to Metro's purported policy or practice of "violating the rights of citizens" are lacking. All Abbey and D.H. allege on this point are: that Metro has an "official pattern, practice, and policy or custom within the Metro Nashville Police Department of violating the rights of its citizens while not following their own policies and procedures" and that in 2019, the MNCO drafted a report that found that Metro used force "against Black people [that] made up approximately 64% of the use of force incidents by the Metro Nashville Police Department despite the Black population only making up 25% of Davidson County's race demographics" and "firearm display as a use of force by the Metro Nashville Police Department was used 68% of the time when confronted with a black person as opposed to other races." (Doc. No. 42 ¶¶ 37, 39–40, 117).

These allegations are insufficient to establish that Metro had either an official policy or a custom of violating its citizen's rights. First, Abbey's and D.H.'s first allegation is a mere recitation of the legal elements of a Monell claim that cannot constitute a factual allegation in its support. See Blackwell, 979 F.3d at 524. As to the allegations about the MNCO report, they are bare as to any facts supporting a conclusion that Metro had a specific written policy, practice, or custom of directing or endorsing unconstitutional uses of excessive force by its officers, or whether the events in the report applied to Abbey or D.H. at all. Pembaur, 475 U.S. at 480–81. At bottom, Abbey's and D.H.'s allegations here amount to mere boilerplate language which this Court has, at various times, found to be "'insufficient to state a municipal liability claim, thereby justifying dismissal under Rule 12(b)(6).'" Spainhoward v. White County, Tennessee, 421 F. Supp. 3d 524, 544 (M.D. Tenn. 2019) (quoting Minick v. Metro. Gov't of Nashville, 2015 WL 3817116, at *2 (M.D. Tenn. Aug. 4, 2014)).

12

The same is true on Abbey's and D.H.'s theory of Monell liability premised on Metro's failure to properly train its officers. On this theory of liability, to the extent Abbey and D.H. allege Metro has alleged this failure to train to be a pattern, they "must show prior instances of unconstitutional conduct demonstrating that [Metro] has ignored a history of abuse and was clearly on notice that the training in a particular area was deficient and likely to cause injury." Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005). Even if they do not contend this failure was from a pattern of past misconduct, Abbey and D.H. must still allege that Metro has "complete[ly] fail[ed] to train the police force," or has engaged in "training that is so reckless or grossly negligent that future police misconduct is almost inevitable[.]" Hays v. Jefferson County, Ky., 668 F.2d 869, 874 (6th Cir. 1982). This is because "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Fisher, 398 F.3d at 849 (citing Stemler v. City of Florence, 126 F.3d 856, 865 (6th Cir. 1997)). From this, it reasons that Metro cannot be held liable under Monell "for the actions of a rouge official[,]" even if Officer Stuckey could be characterized as such, Arnold v. Metro. Gov't of Nashville and Davidson Cty., 2009 WL 2430822 at *3 (M.D. Tenn. Aug. 6, 2009), because an "officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton, Ohio v. Harris, 489 U.S. 378, 390–91 (1989). Rather, Abbey and D.H. must allege that Metro was deliberately indifferent to the need to train, supervise, or discipline its police officers and that such inadequacies led to a violation of their constitutional rights. Id. at 390.

Based on these legal principles, the allegations in the Amended Complaint that Metro failed to train its officers to not violate citizens' constitutional rights fall far short. Abbey's and D.H.'s sole allegation that Metro failed to "train officers regarding their obligations under the Fourth and Fourteenth Amendments and the laws of the State of Tennessee in order to prevent violations of

13

the same and harm to the citizenry," (Doc. No. 42 ¶ 118), does little to demonstrate that Metro had either a pattern of failing to train officers "in a particular area," Fisher, 398 F.3d at 849, or that it was so "reckless or grossly negligent" in its training that misconduct was inevitable. Hays, 668 F.2d at 874. Even Abbey's and D.H.'s MNCO report allegations cannot save this theory of municipal liability, as those, while alleging that Metro officers used force against Black individuals more than others, do not demonstrate: (1) that Metro trained officers to do so; (2) that such uses resulted in violations of those citizens' constitutional rights; or that (3) those facts are even pertinent to these proceedings, given the Amended Complaint is silent on Abbey's and D.H.'s respective races. As with the first theory of Metro's municipal liability, this one also fails.

Because Abbey and D.H. fail to plausibly allege an actionable Monell claim against Metro, Metro's motion will be granted on this claim, and Count IV will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Metro's Motion to Dismiss (Doc. No. 52) and Officer Stuckey's Motion to Dismiss (Doc. No. 54) will be granted, and MNPD, the Metropolitan Nashville Tennessee, or the State of Tennessee will be dismissed from this case for misjoinder under Rule 21. Accordingly, this case will be dismissed.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE